UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ANITA MICHELLE THOMAS,                          :
                                                :
                              Plaintiff,        :
                                                :                    **OPINION AND ORDER**
               -against-                        :                    **14-CV-7366 (DLI)**
                                                :
COMMISSIONER OF SOCIAL SECURITY,                :
                                                :
                              Defendant.        :
-----------------------------------------------------------x
**DORA L. IRIZARRY, Chief United States District Judge:**

On October 24, 2011, Plaintiff Anita Michelle Thomas ("Plaintiff") filed an application,
*pro se*, for Social Security disability insurance benefits ("DIB") under the Social Security Act
(the "Act"), alleging disability beginning on July 10, 2011. *See* Certified Administrative Record
("R."), Dkt. Entry No. 22 at 64.  Her application was denied and she requested a hearing. *Id*. at
81, 87. On March 20, 2013, she appeared *pro se* and testified at a hearing before Administrative
Law Judge Eric N. Eklund (the "ALJ"). *Id*. at 24-63. By a decision dated May 3, 2013, the ALJ
concluded that Plaintiff was not disabled within the meaning of the Act. *Id*. at 10-23. On
November 4, 2014, the ALJ's decision became the Commissioner's final decision when the
Appeals Council denied Plaintiff's request for review. *Id*. at 1-6. This appeal followed.

Plaintiff, through counsel, filed the instant appeal seeking judicial review of the denial of
benefits pursuant to 42 U.S.C. § 405(g), on December 15, 2014. *See* Complaint ("Compl."), Dkt.
Entry No. 1. The Commissioner moved for judgment on the pleadings under Rule 12(c) of the
Federal Rules of Civil Procedure, seeking affirmance of the denial of benefits. *See* Mem. of Law
in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem."), Dkt. Entry No. 18. In turn,
Plaintiff cross-moved for judgment on the pleadings, seeking denial of the Commissioner's
motion and requesting that the matter be remanded for further proceedings. *See* Mem. of Law in

Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem."), Dkt. Entry No. 20. For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied; Plaintiff's motion is granted; and this action is remanded to the Commissioner for additional proceedings consistent with this Opinion and Order.

## BACKGROUND[1]

**A.      Non-Medical and Self-Reported Evidence**

Plaintiff was born in 1969 and possesses a GED.[2] R. 34, 119. She has no vocational or professional training, certificates, or licenses, never possessed a driver's license, and does not have a computer at home. *Id.* at 34-35. A single woman with no children, she lives in an apartment with a sister who has helped care for her since she suffered a sudden stroke and heart attack in July 2011. *Id.* at 33, 37, 53, 197-98. Plaintiff was unemployed at the time of her stroke, having been laid off from her most recent position as an office assistant at an advertising firm in 2010, where she worked for approximately ten years.[3] *Id.* at 188-89, 209. Prior to that, from 1996 to 2000, she was a customer service representative at a credit union.[4] *Id.* at 189, 208. In October 2011, approximately one year after she was last employed and one month following her stroke, Plaintiff began receiving unemployment benefits and filed an application for DIB under the Act. *Id.* at 36, 64, 119-20.

---

[1] Having thoroughly and carefully reviewed the administrative record, the Court finds the Commissioner's factual background accurately represents the relevant portions of said record. As such, the following background is taken substantially from the "Background" section of the Commissioner's brief, except as otherwise indicated.

[2] Plaintiff was forty-one years old on the alleged disability onset date, July 10, 2011. Consequently, Plaintiff was a "younger person" as defined by 20 C.F.R. § 404.1563(c).

[3] Plaintiff noted in her disability report that she was employed until December 2010. *Id.* at 207. Since Plaintiff affirmatively indicated that she stopped working in October 2010, the Court assumes the December 2010 date to be erroneous. *Id.* at 188.

[4] In her function report, Plaintiff reported that she began working at the credit union in November 1997. *Id.* at 207. As counsel for Plaintiff relies upon the 1996 date, the Court assumes the November 1997 to be erroneous. *See* Pl. Mem. at 2.

In October 2011, Plaintiff submitted a disability report with her application for DIB, explaining that she had stopped working because she "was laid off from her last position in October 2010 and had a heart attack in July 2011." *Id*. at 188. Approximately one month later, in November 2011, she completed a function report, wherein she stated that her daily activities consisted of taking medication, exercising her legs, eating healthy meals, and watching television. *Id*. at 197-98, 201. Although Plaintiff stated that she did not regularly socialize with others, she went to church on Sunday three times every month, and, if she did go out otherwise, it was for doctors' appointments, getting medication, or weekly shopping for food and clothes. *Id*. at 200-02. When she traveled alone, she used public transportation. *Id*. at 200. She reported that she prepared meals three to four times a day, did laundry at a public facility (with assistance lifting and folding), and could pay bills and manage a savings account. *Id*. at 199-201. Her sister did the house work. *Id*. at 200.

The function report also included a notation that an impairment to her left arm impacted her personal care; although right-hand dominant, Plaintiff stated that she could not reach with her left arm. *Id*. at 198, 203-04. She also said that her handwriting was affected and that she could not properly hold a pen. *Id*. at 203. She claimed that she had weak vision in the left eye, slurred speech, a stutter, and could not stay focused when reading. *Id*. at 204. Plaintiff further conveyed that while she could walk, climb stairs, and kneel slowly, she neither could lift heavy objects nor stand for long periods of time. *Id*. at 202-03. According to Plaintiff, she could walk a block or two before having to stop and rest for a few minutes and sitting caused leg cramps. *Id*. at 203-04. She reported that her medication made her drowsy and that her sleep was affected only insofar as she suffered occasional nosebleeds. *Id*. at 198, 202. She did not use any assistive devices. *Id*. at 204.

In another disability report prepared in February 2012, Plaintiff asserted that her condition was unchanged from October 2011. *Id*. at 217. She stated that she could not stand or walk for more than thirty minutes[5] and could not perform any "heavy" lifting or bending. *Id*. at 217, 223. She also explained that she constantly had to use the bathroom due to "very weak kidneys" (which, she said, were functioning at thirty percent in August 2011). *Id*. at 217, 220. She reported changes in "walking, standing, moving [her] arms, using [her] hands and fingers, climbing steps, lifting objects[, and] using the restroom every [fifteen] min." *Id*. at 223. She indicated that her blood pressure medications included Benazepril, Clonidine, Metoprolol, Nifedical, and Norvasc; however, she claimed that these caused dizziness, nausea, and sleepiness. *Id*. at 222. In a medication form dated March 5, 2013, Plaintiff reported that she was taking Amlodipine, Metoprolol, Hydralazine, Clonidine, Furosemide, and Ferrous Sulfate.[6] *Id*. at 230.

**B.      Plaintiff's Testimony Before the ALJ**

Plaintiff appeared at the hearing held on March 20, 2013.[7] *Id*. at 24-63. Although apprised of her right to obtain representation, she elected to proceed *pro se* and signed a waiver to that effect. *Id*. at 26-27, 118. The ALJ asked Plaintiff if any medical evidence was missing from the scant record and assured her that he would issue subpoenas to obtain any missing records. *Id*. at 30-32. The ALJ indicated that he would send her for a consultative examination and provided her with two "residual functional capacity" ("RFC") report forms to take to two

---

[5] Later in this disability report, Plaintiff cut this number in half, writing that she could not stand or walk for more than fifteen minutes. *Id*. at 223.

[6] The Commissioner's moving papers include a citation to medication listed on page 231, a sheet dated March 4, 2013. Def. Mem. at 3. The Court notes that this page—part of the Certified Administrative Record—does not pertain to Plaintiff, but rather to a different individual with a different name and Social Security Number.

[7] The hearing was held remotely, with Plaintiff in Brooklyn, New York, and the ALJ in Lawrence, Massachusetts. R. at 26.

upcoming appointments—one for a "kidney doctor" and one for a "medical doctor." *Id*. at 53-55, 61-62.

Plaintiff testified that she lived with her sister and had traveled by public transportation (bus and train) for one hour to attend the hearing. *Id*. at 33, 35, 39. She admitted that she was on Medicaid and receiving public assistance for her rent and food. *Id.* at 35-36. She stated that she had received unemployment benefits until August 2012 and, although she certified that she was ready, willing, and able to work, she contended that her "body wasn't." *Id.* at 36.

She stopped working because of a heart attack and a stroke caused by high blood pressure in July 2011. *Id*. at 37. While in the hospital recovering, Plaintiff learned that her kidneys were functioning at about twenty-seven percent. *Id.* at 37, 40. The stroke affected her left side, her speech was not fully back to normal, and she was incapable of walking on her own until September 2011. *Id*. at 37-38. She maintained that, although she had received speech therapy for two weeks in the hospital in July 2011—and had two sessions after she was discharged—she still could not express herself fully verbally. *Id.* at 37-38. She explained that she could not stand for a long time. *Id.* at 37, 39. Plaintiff testified that the most significant problem remaining from her stroke was her kidney problem, resulting in difficulty urinating, general feelings of fatigue, loss of appetite, and pain felt about three times per week. *Id.* at 39, 41. She did not want dialysis but was optimistic about starting a new medicine. *Id.* at 40.

Plaintiff added that her left side was very weak as a result of the stroke. *Id*. at 43. She could not carry, lift, or hold items up with her left hand for any length of time. *Id*. For example, she stated that she could not carry her purse on her left side because it "pain[ed her] to do so." *Id*. at 45. Similarly, she could not reach overhead with her left arm for an extended period of time. *Id*. at 44-45. She maintained that she could not type like she did before the stroke because of a

pinching sensation when bending her fingers into "the typing position." *Id*. at 43-44. Plaintiff noted numbness in her hand and feet, but did not know if it was related to the stroke or a side effect of her medications. *Id*. at 46.

Plaintiff further testified that she did not cook aside from using the microwave and did not clean her residence beyond straightening her room. *Id*. at 47-48. She explained that she shopped for clothing and light food items. *Id*. at 48. Insofar as her daily activities, she said that she showered, read, watched television, napped, performed stretches for her left side, and practiced writing. *Id*. at 48-51. She attended religious services on a weekly basis (sometimes going during the week as well) and scheduled three or four doctors' appointments every month. *Id*. at 48, 50, 52. She stated that she could not be in a stressful environment because of her high blood pressure and that she experienced heart palpitations. *Id*. at 42, 47.

**C.      Vocational Expert's Testimony Before the ALJ**

Christine Spaulding appeared as a vocational expert ("VE") at the hearing. *Id*. at 55-60. She stated that Plaintiff's past work as a customer service representative for a credit union would qualify as skilled work generally performed at a light exertion level. *Id*. at 56-57. The VE categorized the remainder of Plaintiff's work experience as an administrative clerk performed at a light exertion level. *Id*. at 57.

The ALJ then posed a hypothetical to the VE ("Hypo # 1") of an individual with Plaintiff's age, education, and work experience limited to light work, but who could stand and walk for no more than four hours in an eight-hour workday. *Id*. The individual in Hypo # 1 only occasionally could push or pull with the left arm and perform foot control operations with the left leg. *Id*. This individual never could climb ladders, ropes, or scaffolds, or crawl or kneel, but

occasionally could climb ramps or stairs, balance, stoop, or crouch. *Id.* This same individual was limited to occupations that did not require frequent verbal communication. *Id.* at 57-58.

The VE testified that the individual in Hypo # 1 would not be able to perform Plaintiff's past work, but that there were jobs in the national or regional economies that such an individual could perform at the light and sedentary physical levels. *Id.* at 58. At the light level, "price marker" jobs allowed for standing or walking only four hours a day.[8] *Id.* The VE explained that such positions were unskilled, with 150,000 jobs available nationally and 10,000 regionally. *Id.* Alternatively, the VE testified that at the light level, there were jobs as "sorters" who put things in alphabetical or numerical order.[9] *Id.* According to the VE, these positions had 53,000 jobs available nationally, with 3,800 jobs regionally. *Id.*

The ALJ then modified the constraints of the person in the hypothetical, making them sedentary ("Hypo #2"). *Id.* at 59. At the sedentary level, the VE testified that "document preparer" and "addresser jobs" would be appropriate for the individual in Hypo # 2.[10] A document preparer had 15,000 jobs nationally and 1,000 jobs regionally, whereas an addresser had 9,000 jobs nationally and 1,500 jobs regionally. *Id.* at 58-59.

Building onto the hypothetical, the ALJ added the limitation that the individual only occasionally could reach, manipulate, finger, and feel with the non-dominant left arm ("Hypo # 3"). *Id.* at 59-60. The VE testified that there would be no light jobs for the individual in Hypo # 3. *Id.* at 60. The ALJ then altered the hypothetical, asking if there would be any sedentary jobs

---

[8] The VE testified that this job title was listed in the U.S. Department of Labor's *Dictionary of Occupational Titles* at Code 209.587-034. *Id.* at 58; *see also Dictionary of Occupational Titles*, U.S. DEP'T OF LABOR, http://www.oalj.dol.gov/LIBDOT.HTM [hereinafter *DOT*].

[9] The VE testified that this job title was listed in the *Dictionary of Occupational Titles* at Code 209.687-022. *Id.* at 58; *see also DOT*.

[10] The VE testified that these job titles were listed in the *Dictionary of Occupational Titles* at Codes 249.587-018 and 209.587-010, respectively. *Id.* at 58-9; *see also DOT*.

for such an individual ("Hypo #4"). *Id*. at 60. The VE identified "surveillance system monitor" as a potential position for the individual in Hypo #4.[11]

Finally, the ALJ further limited the individual in Hypo #4, adding the restriction that he or she would be unable to engage in sustained work activity for a full eight-hour workday on a regular and consistent basis ("Hypo # 5"). *Id*. at 61. The VE testified that there would be no jobs for the individual in Hypo # 5. *Id*.

### D.    Medical Evidence

#### i.    *McLeod Regional Medical Center*

On July 9, 2011, Plaintiff reported to McLeod Regional Medical Center in Florence, South Carolina, complaining of slurred speech, dizziness, blurred vision, and weakness. *Id*. at 272, 318. She had a history of hypertension and noncompliance with its treatment. *Id*. at 272. She stated that she ran out of her medications approximately two weeks before, and that she had not felt well since refilling her prescription. *Id*. at 318 Upon examination, she had difficulty speaking fluently, and she looked lethargic and slow. *Id*. at 319. Cranial nerves II and XII were intact, her neck was supple, and there was no thyromegaly or lymphadenopathy. *Id*. Examinations of the chest, heart, abdomen and legs were normal. *Id*. Neurological examination showed Babinski's downgoing bilaterally. *Id*. Plaintiff had 3+ hyper reflexive, deep tendon reflexes in both knees. *Id*. She had "good strength" bilaterally at 4/5 in her arms. *Id*. Nasolabial folds were intact. *Id*. Her right arm was slightly weaker than the left, with slight arm drift. *Id*. She was admitted for care and to rule out a cerebrovascular accident ("CVA"). *Id*. at 320.

She underwent a number of tests while hospitalized. An echocardiogram revealed moderate to severe hypertrophy. *Id*. at 314. Laboratory tests revealed an elevated creatinine

---

[11] Although the VE did not testify to the Code at the hearing, this job title is listed in the *Dictionary of Occupational Titles* at Code 379.367-010. *See DOT*.

level, and an ultrasound of the kidneys revealed that she might have chronic kidney disease ("CKD"). *Id*. at 292. In addition, an MRI of the brain showed extensive demyelination pattern throughout the cerebral hemisphere and right cerebellum. *Id*. at 405. She remained hospitalized, received treatment over the course of ten days, and was released when her blood pressure was stabilized. *Id*. at 272. At neurology consultations on July 13, 14, and 15, Plaintiff talked and communicated well with no focal weakness or numbness. *Id.* at 358, 360, 362. At neurology consultations on July 17, Plaintiff felt better and was able to walk around. *Id*. at 354.

She was discharged on July 19, 2011, and her discharge diagnoses were: malignant hypertensive emergency; dizziness and slurred speech; obstructive sleep apnea; CKD stage IV; weight loss; anemia; and non-ST elevation myocardial infarction (NSTEMI). *Id.* at 272. Among other medications, physicians prescribed Amlodipine, Labetalol, Clonidine, Valsartan, and Hydralazine for high blood pressure. *Id*. at 273.

### ii. HopeHealth

Plaintiff visited HopeHealth in Florence, South Carolina, on August 23, 2011. *Id*. at 257-59. She reported that her hypertension home readings had significantly improved. *Id*. at 257. She had been gaining weight and was not experiencing fatigue or pain. *Id*. at 258. On examination, her blood pressure was 139/88. *Id*. Cardiovascular examination revealed regular rate and rhythm with no murmurs, gallops, or rubs. *Id.* Pedis pulses were normal in the extremities, and there was no edema. *Id*. at 259. Plaintiff's memory was intact, and the psychiatric examination was normal. *Id.* Physician's Assistant ("P.A.") Alan Barrett diagnosed hypertension and anemia not otherwise specified (NOS). *Id.* She was advised to not take Clonidine or Hydralazine until seen by a nephrologist. *Id*. Labetalol, Amlodipine, and Benazepril were continued. *Id*.

She had no complaints when she saw P.A. Barrett again on September 29, 2011. *Id*. at 253. She had been compliant with her medication, but was out of Amlodipine and had continued to take Clonidine. *Id*. She said that Clonidine caused her fatigue, but no chest pain or shortness of breath. *Id*. She expressed a desire to travel to New York in a month's time and wanted to stay for one month. *Id*. Her blood pressure was 178/115. *Id*. at 254. Cardiovascular and respiratory examinations were normal. *Id*. at 255. Ranges of motion, muscle strength, stability, and sensation were normal in all extremities with no pain. *Id*. Her memory was intact and her deep tendon reflexes were preserved and symmetric. *Id*. Plaintiff was diagnosed with hypertension, unspecified. *Id*. at 256. P.A. Barrett told her not to take Clonidine, switching Labetalol to Metoprolol and Amlodipine to Nifedipine; she was to continue Benazepril and exercise. *Id*.

On October 19, 2011, Plaintiff told P.A. Barrett that she was taking medication as prescribed, but her blood pressure had been elevated since starting the new medication. *Id*. at 249. Examinations and diagnoses were consistent with those on September 29, 2011. *Id*. at 250-51.

### iii. *East New York Diagnostic & Treatment Center*

On January 10, 2012, Plaintiff visited East New York Diagnostic & Treatment Center ("East New York") as a walk-in patient to refill a medication she finished weeks prior. *Id*. at 483-85. Her blood pressure was 200/110. *Id*. The psychiatric, neurological, heart, and extremity examinations were normal. *Id*. at 484. Clonidine was given, and she "adamantly refuse[d]" a second dose after an extensive explanation of the benefits of the medication to avoid the possibility of a stroke or heart attack and "state[d] she accept[ed] the consequences of noncompliance." *Id*. at 483. She signed out against medical advice, and was stable when she left.

*Id.* The diagnosis was unspecified essential hypertension uncontrolled (out of medication). *Id.* at 484.

She returned to East New York on August 14, 2012, seeking refills for medication she finished more than a week prior. *Id.* at 480-82, 488-90. Her blood pressure was 190/100. *Id.* at 480. She denied headache or blurred vision and claimed that the Clonidine made her drowsy. *Id.* Her blood pressure decreased to 140/90 after she was given medication. *Id.* at 481. The psychiatric, neurological, heart, back, extremities, and musculoskeletal examinations were normal. *Id.* The diagnosis was unspecified essential hypertension due to non-compliance with medications. *Id.* The importance of compliance was explained and she was to return in two weeks. *Id.*

### iv.        *Consultative Examination by Dr. Mescon*

On January 17, 2012, Plaintiff was consultatively examined by Marilee Mescon, M.D., an internist. *Id.* at 238-41. Dr. Mescon reported that Plaintiff's kidney function was thirty percent, and she neither had dialysis nor been placed on a kidney donation list. *Id.* at 238. She experienced chest pain when she did not take her medication. *Id.* She reported that she lived with her sister, who did the shopping, cooking, and cleaning, but she could do light shopping, shower, bathe, and dress. *Id.* at 238-39. She spent her time watching television, listening to the radio, and reading. *Id.* at 239.

Upon examination, Plaintiff's blood pressure was 190/120, and she was advised to see her doctor immediately. *Id.* at 239, 242. She appeared to be in no acute distress. *Id.* at 239. Her gait was normal, and she could walk on heels and toes without difficulty. *Id.* She could perform a full squat and had a normal stance. *Id.* She used no assistive devices, needed no help changing for the examination or getting on and off the examination table, and was able to rise from a chair

without difficulty. *Id*. Examinations of the eyes, ears, nose, throat, neck, chest, lungs, and heart were normal. *Id*. The musculoskeletal examination showed full ranges of motion in the cervical and lumbar spines. *Id.* at 240. Active straight leg raising in a supine position was to twenty degrees on the left and sixty degrees on the right. *Id*. Active straight leg raising in a seated position was to ninety degrees bilaterally on both the left and right. *Id*. There were full ranges of motion of the shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally. *Id*. There were no evident subluxations, contractures, ankylosis, or thickening. *Id*. Joints were stable and nontender, without redness, heat, swelling, or effusion. *Id*. The deep tendon reflexes were physiologic and equal in the arms and legs. *Id*. There was loss of sensation over the left upper and lower arm and left upper and lower leg. *Id*. Motor strength was 4/5 in her left arm and left leg, and 5/5 in her right arm and right leg. *Id*. The extremities showed no cyanosis, clubbing, or edema. *Id*. Pulses were physiologic and equal. *Id*. There were no significant varicosities, trophic changes, or muscle atrophy. *Id*. Hand and finger dexterities were intact and grip strength was 5/5 bilaterally. *Id*.

Dr. Mescon diagnosed poorly controlled hypertension, early renal insufficiency, history of a stroke with mild left hemiparesis and left hemisensory loss, history of a heart attack, and kidney failure. *Id*. Plaintiff's capacity to climb, push, pull, or carry objects was moderately to severely limited by all of her medical problems. *Id*. at 241.

> ### v. *Interfaith*

On September 18, 2012, Plaintiff reported to the Interfaith Medical Center for treatment of vaginitis. *Id*. at 457, 461, 467-68. Her diagnoses were: hypertension; CVA with no residual weakness; questionable CKD; fibroids; anemia; and trichomoniasis. *Id*. at 457. The examiner noted that Plaintiff's hypertension was uncontrolled, likely due to non-compliance. *Id*. Her blood

pressure was 183/104. *Id*. at 468. She was seen again on October 4, 2012, at which time she reported some mild left-sided weakness after CVA, but no residual deficits. *Id*. at 452. She complained of shortness of breath when she walked for long distances or climbed stairs, claiming that her functional capacity was three to five blocks. *Id*. Chest, cardiovascular, and nervous system examinations were normal. *Id*. Her blood pressure was 158/94. *Id*. There was mild swelling in the extremities. *Id*. The diagnoses were, *inter alia*: hypertension uncontrolled; status post CVA (stable) with no residual weakness; CKD; and heart attack (stable). *Id*. at 447. Plaintiff was counseled about diet and exercise. *Id*.

On October 10, 2012, Doppler testing of the heart indicated marked left ventricular hypertrophy with normal systolic function. *Id*. at 437.

Plaintiff was seen again on October 16, 2012, at which time she complained of shortness of breath upon strenuous activity (*i.e.*, walking four or five blocks). *Id.* at 438. She had no chest pain, numbness, or swelling. *Id*. Her blood pressure was 175/106. *Id*. at 441-42.

On November 15, 2012, a renal ultrasound was performed and showed parenchymal disease of the kidney. *Id*. at 435. A pelvic sonogram revealed uterine fibroid masses and a large left ovarian cyst. *Id*. at 434.

On February 14, 2013, Plaintiff saw Chawmay Aye, M.D., at Interfaith. *Id*. at 428-32. She had come to refill her medications, stating that she been without medication for three days, but experienced no headaches, vision problems, or vomiting. *Id*. at 428. She reported a history of iron deficiency anemia, a uterine fibroid, and CKD stage three. *Id*. She said she had frequent urination, constipation, and no abdominal pain. *Id*. Her blood pressure was 230/120.[12] *Id*. at 430. Her motor system, cranial nerves, gait, and reflexes were normal. *Id*. There was no weakness and her reflexes were 2+ throughout. *Id*. Dr. Aye diagnosed hypertensive urgency due to missed

---

[12] After Clonidine was administered, Plaintiff's blood pressure fell to 207/96. *Id*. at 431.

medications, iron deficiency anemia due to a fibroid, CKD stage 3 (stable), vagina candidiasis, constipation, and parathyroid 73. *Id*. at 431.

      *vi.*     ***Consultative Examination by Dr. Tranese***

On April 11, 2013, Plaintiff was consultatively examined by Louis Tranese, D.O., a physical medicine and rehabilitation specialist. *Id*. at 469-471. She had no orthopedic complaints, and reported a history of a CVA, for which she had been hospitalized in 2011. *Id*. at 469. She reported left-sided weakness, but her strength had improved through physical therapy. *Id*. She currently participated in a home exercise program every two days. *Id*. She said she independently cooked three days per week, but depended on her family for cleaning, laundry and shopping chores. *Id*. at 470. She was able to shower, dress, and groom herself independently on a daily basis. *Id*. Her blood pressure was 120/80. *Id*. Her gait and station were normal and she could walk on heels and toes without difficulty or assistive device. *Id*. She did not need help changing for the examination, getting on or off the examination table, and was able to rise from a chair without difficulty. *Id*. Her hand and finger dexterities were intact and her grip strength was full 5/5 bilaterally. *Id*. She had full ranges of motion of cervical, thoracic, and lumbar spines. *Id*. There was no tenderness or muscle spasm. *Id*. Straight leg raising was negative. *Id*. There were no trigger points. *Id*. There were full ranges of motion of the shoulders, elbows, forearms, wrists, and fingers bilaterally. *Id*. There was no joint inflammation, effusion, or instability. *Id*. Strength was full 5/5 in the proximal and distal muscles. *Id*. There was no muscle atrophy, no sensory abnormality, and her reflexes were physiologic and equal. *Id*. She had full ranges of motion in the bilaterally upper extremities. *Id*. Ranges of motion and muscle strengths were full 5/5 in her hips, proximal knees, ankles, and distal muscles, bilaterally. *Id*. at 470-71. There was no muscle

atrophy or sensory abnormality, and her reflexes were physiologic and equal. *Id*. at 471. There was no joint effusion, inflammation, or instability. *Id*.

Dr. Tranese diagnosed history of CVA, history of myocardial infarction as per the claimant, and history of hypertension. *Id*. He opined that Plaintiff's prognosis was excellent functionally and that she had no physical functional deficits. *Id*. at 471, 472-79.

E.      **Evidence Submitted to the Appeals Council After the ALJ Issued His Decision**

In a letter dated June 25, 2013, Dr. Leon Shein of Prospect Medical Group wrote that Plaintiff had chronic renal failure and hypertension. *Id*. at 504. On July 17, 2013, Plaintiff was examined by Interfaith's Ambulatory Care Services and given a form letter to return to work after three days off.[13] *Id*. at 505. Her kidney disease stage was 30.665. *Id*. at 508.

## **DISCUSSION**

A.      **Standard of Review**

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d

---

[13] Based upon the record and submissions, it is unclear whether Plaintiff currently is employed (or was during her appointment in 2013).

751, 755 (2d Cir. 1982) (internal citations and quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp.2d 559, 568 (E.D.N.Y. 2004) (internal citations omitted). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (internal citations and quotation marks omitted).

**B.    Disability Claims**

To receive DIB, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Additionally, the claimant's impairment must have been of such severity that she is unable to do her previous work or, considering her age, education, and work experience, she could not have engaged in any other kind of substantial

gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). The claimant bears

the initial burden of proof as to his or her disability status and is required to demonstrate

disability status by presenting medical signs and findings, established by medically acceptable

clinical or laboratory diagnostic techniques, as well as any other evidence the Commissioner may

require. *See* 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705

F. 2d 638, 642 (2d Cir. 1983) (internal citations omitted).

ALJs must adhere to a five-step analysis in determining whether a claimant is disabled

under the Act, as set forth in 20 C.F.R. § 404.1520.

The first step is determining whether the claimant is engaged in "substantial gainful

activity." *See* 20 C.F.R. §§ 404.1520(a)(4)(i), (b). If the claimant is engaged in substantial

gainful activity, benefits are denied. If the claimant is not engaged in a "substantial gainful

activity," the second step is evaluating whether the claimant has a "severe impairment" without

reference to age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). An

impairment is "severe" when it significantly limits the claimant's physical or mental ability to

conduct basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant's impairment is not

severe, benefits are denied. If the impairment is "severe," the third step is considering whether

the identified impairment meets or is equivalent to an impairment listed in 20 C.F.R. § 404,

Subpart P, Appendix 1 ("the Listings"). *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d). If the ALJ

determines that the claimant's impairment meets or equals an impairment in the Listings, the

analysis ends and the claimant is found disabled.

If the claimant does not have a listed impairment after the third step, the two remaining

steps require the ALJ to make findings about the claimant's RFC. 20 C.F.R. § 404.1520(e). At

the fourth step, the ALJ performs an analysis of the claimant's RFC in combination with the

claimant's age, education, and work experience to determine if he or she can perform past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). If the claimant can still perform past relevant work, they are not considered disabled.

Finally, if the ALJ finds that the claimant cannot perform past relevant work, the fifth step requires the ALJ to assess whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines that the claimant can adjust and perform other existing work, he or she is not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), (g). At the fifth and final step, the burden shifts to the Commissioner to demonstrate that the particular claimant could perform other work. *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (quoting *Carroll,* 705 F. 2d at 642).

## C.  The ALJ's Decision

On May 3, 2013, the ALJ issued a decision denying Plaintiff's claims. R. at 10-23. The ALJ followed the five-step procedure in making his determination that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with additional limitations, and, therefore, was not disabled. *Id*. at 13, 16. At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 10, 2011, the alleged onset date. *Id*. at 15. At the second step, the ALJ found the following severe impairments: status post heart attack, status post kidney failure, early renal insufficiency, hypertension, and left sided hemiparesis and hemisensory loss status post-stroke. *Id*. at 15. At the third step, the ALJ concluded that Plaintiff's impairment or combination of impairments did not meet or medically equal the severity of one of impairments in the Listings. *Id*. at 15.

At the fourth step, the ALJ found that Plaintiff could perform light work as defined in 20 C.F.R. § 404.1567(b), but with additional limitations:

> She can walk or stand for four hours in an [eight]-hour day. She can occasionally push or pull with the upper left extremity, and occasionally perform foot control operations with the lower left extremity. She can occasionally balance, stoop, crouch, or climb ramps and stairs; but never crawl, kneel, or climb ladders, ropes, or scaffolds. She should avoid concentrated exposure to extreme cold, heat, wetness, or humidity. She cannot perform work which requires frequent verbal communications, i.e. requiring her to speak on a frequent basis.

*Id*. at 16. The ALJ determined the RFC by considering the objective medical evidence in the record, the consultative opinions, and Plaintiff's subjective complaints. *Id*. at 16-18. While the ALJ found that Plaintiff's medically determinable impairments reasonably could be expected to cause the alleged symptoms, he found her statements concerning the intensity, persistence, and limiting effects of those symptoms "not entirely credible." *Id*. at 16. The ALJ's conclusion was drawn from the inconsistences among Plaintiff's reported symptoms, medical records, her appearance at the hearing, her non-compliance with treatment regimens, and her overall lack of treatment. *Id*. at 16-18. Despite the ALJ's doubts concerning credibility, he noted that he took "into consideration her reported problems." *Id*. at 18.

Ultimately, the ALJ found that the Plaintiff was unable to perform her past relevant work as a customer service representative and administrative clerk because, although she was still capable of performing light work, her past jobs required frequent verbal communication, which she was unable to do. *Id*. at 19. The ALJ noted that, if Plaintiff had the RFC to perform a full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21, but Plaintiff had additional limitations for which he sought the opinion of the VE. *Id*. Relying upon the VE's testimony, the ALJ found three occupations (*i.e.*, "price marker,"

"sorter," and "document preparer") in the national and regional economies for an individual with Plaintiff's characteristics based upon the information contained in the *Dictionary of Occupational Titles*. *Id.* at 20.

At the fifth step, considering the Plaintiff's age, education, work experience, residual functional capacity, and the VE's testimony, the ALJ concluded that, "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.*

## E.    Analysis

The Commissioner moves for judgment on the pleadings, seeking affirmance of the denial of Plaintiff's benefits on the grounds that the ALJ applied the correct legal standards to find that Plaintiff was not disabled and that the factual findings are supported by substantial evidence. *See generally* Def. Mem. Plaintiff cross-moves for judgment on the pleadings, opposing the Commissioner's motion, and seeks remand, arguing that: (1) the ALJ failed to develop the record by not obtaining RFC opinions from Plaintiff's treating physicians; (2) the ALJ failed to develop the record specifically as to Plaintiff's kidney disease; (3) the ALJ's conclusions as to Plaintiff's functional limitations were not supported by substantial evidence; and (4) the ALJ's conclusion that Plaintiff's testimony was not credible was not supported by substantial evidence. *See* Pl. Mem. at 16-25. Upon review, the Court finds that the ALJ failed to fully develop the record.

### i.    *Unchallenged Findings*

The ALJ's findings as to steps one, two, and three are unchallenged. *See* Def. Mem., Pl. Mem., Reply Mem. of Law in Further Supp. of Def.'s Mot. For J. on the Pleadings ("Reply Mem."), Dkt. Entry No. 21. Upon a review of the record, the Court concludes that the ALJ's

findings at steps one through three are supported by substantial evidence.


ii.    *Failure to Develop the Record*

Plaintiff argues that the ALJ failed to develop the record with treating physician opinions generally, and as to her kidney disease, specifically.[14] Pl. Mem. at 16-19. The Commissioner counters by asserting that the lack of a treating physician's opinion does not require remand and, in any event, that it was Plaintiff's responsibility to supply the ALJ with the information. *See* Reply Mem. at 4-5. The Commissioner is in error, particularly since Plaintiff appeared *pro se* at the hearing and the ALJ had an affirmative duty to develop the record, as discussed more fully below.

As a result of the non-adversarial nature of Social Security benefit determinations, an ALJ has "an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (quoting *Echevarria,* 685 F.2d at 755). Furthermore, "[w]hen a claimant properly waives his [or her] right to counsel and proceeds *pro se*, the ALJ's duties are 'heightened.'" *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). This duty includes assembling a claimant's medical history, contacting treating physicians if the information received is insufficient to determine disability, explaining the importance of evidence, and "[a]t a minimum, if the ALJ is inclined to deny benefits, he should advise a claimant that her case is unpersuasive and suggest that she supplement the record or call her treating physician as a witness." *Batista v. Barnhart*, 326 F.

---

[14] Plaintiff unsuccessfully attempts to fashion a second argument concerning the ALJ's failure to develop the record by focusing on her kidney disease, only. *See* Pl. Mem. at 18-19. The core complaint in both "failure to develop the record" arguments is that the "ALJ failed to obtain medical source statements" from the kidney specialist she was scheduled to see after the hearing. Pl. Mem. at 18. Accordingly, the Court considers this part of Plaintiff's argument that the ALJ failed to develop the record.

Supp.2d 345, 354 (E.D.N.Y. 2004) (internal citations omitted). Where the ALJ has failed to develop the administrative record, remand for a new hearing is appropriate. *See Callahan,* 168 F.3d at 80-81, 83.

However, despite the ALJ's duty to develop the record, the law in this Circuit is clear: the failure of an ALJ to request formal opinions from treating physicians is not reflexively fatal where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. Apr. 2, 2013) (internal citations omitted); *see also Whipple v. Astrue*, 479 F. App'x 367, 370 (2d Cir. May 2, 2012) (the ALJ's failure to secure a treating physician's opinion was not legal error when he possessed comprehensive medical notes); *Blair v. Astrue*, No. 11-CV-2753 (DLI), 2013 WL 782619, at *8 (E.D.N.Y. Mar. 1, 2013) ("[W]here the record contains [p]laintiff's comprehensive medical records and consulting medical experts provided opinions consistent with the ALJ's findings, the ALJ [is] not required to seek additional materials from [p]laintiff's treating physicians.") (internal citations omitted).

At the hearing, the ALJ noted that the record consisted of treatment records from McCleod Regional Medical Center in July 2011, Dr. Mescon's consultative examination in January 2012, "and that's about it." R. at 30. Plaintiff then provided the addresses of three separate facilities in New York City where she had received treatment: Interfaith Health Clinic; East New York; and Interfaith Hospital. *Id*. at 31-32. The ALJ explained that he would subpoena Plaintiff's medical records from those locations before issuing his decision to glean a "good solid snapshot of [her] medical care." *Id*. at 32, 61. Although medical records from these facilities were outstanding at the time of the hearing, they were included in the record and considered by the ALJ in issuing his decision. *Id*. at 424-68, 480-97, 503, 505-09.

The ALJ also asked if Plaintiff had any upcoming medical appointments because he wanted "to get those medical records" and would "ask for those" as well. *Id*. at 53. Plaintiff responded that she had two appointments scheduled—one with "the kidney doctor" and the other with an unspecified "medical doctor." *Id*. at 53. The ALJ asked the Hearing Monitor to give Plaintiff RFC forms for her physicians to complete at the upcoming appointments and explained that "it would be helpful" if she asked the doctors to complete the forms and explain her physical capabilities and limitations. *Id*. at 54. The ALJ observed that there was "not a lot of medical evidence" and explained to Plaintiff that "the more medical evidence I have documenting the shortcomings and the problems that you have, obviously, the better it is for your case . . . ." *Id*. He emphasized, "I'm just trying to help you out here. So, if you could get those forms filled out and give them to Social Security, that would be very helpful in terms of making an informed decision with your case." *Id*. at 55. At the close of the hearing, he stressed that the RFC forms were "very important" and suggested Plaintiff physically take the completed forms to the local Social Security office to confirm receipt. *Id*. at 61-62.

Despite the ALJ's statements on the record about the importance of the RFC forms and how they would help him make "an informed decision," there is no dispute that he rendered his decision without the benefit of any opinions from Plaintiff's subsequent treating physicians. *See generally* R., Def. Mem., Pl. Mem., Reply Mem. When the ALJ recognized that he needed those documents to make a decision, and requested that Plaintiff see to their completion, he was bound to "make every reasonable effort" to help Plaintiff obtain that information. *See* 20 C.F.R. §§ 404.1512(d). Under the applicable regulation:

> "Every reasonable effort" means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one followup

request to obtain the medical evidence necessary to make a determination. The medical source will have a minimum of 10 calendar days from the date of our followup request to reply, unless our experience with that source indicates that a longer period is advisable in a particular case.

20 C.F.R. § 404.1512(d)(1).

There is no indication in the record that the ALJ followed up with Plaintiff on the status of her RFC forms. *See generally* R. Similarly, the record is bereft of any hint that the ALJ independently, whether by a post-hearing subpoena or otherwise, sought RFC forms from any treating physician. *See generally Id*. Furthermore, the ALJ's decision makes absolutely no mention of his request to Plaintiff or explains why, after receipt of the subpoenaed medical records, he no longer required the "very important" RFC forms and could render an "informed decision" without them. *See Id*. at 10-20. As the ALJ failed to follow up with Plaintiff concerning the RFC forms he requested, he failed to exercise "every reasonable effort" to help her acquire that necessary information and properly develop the record. *See Devora v. Barnhart*, 205 F. Supp.2d 164, 175 (S.D.N.Y. 2002) ("The problem is that the ALJ did not take 'reasonable' steps to investigate the failure to procure" the RFC form after asking the plaintiff, during the hearing, to get one from her doctor.); *see also, generally, Falco v. Astrue*, No. 07-CV-1432 (FB), 2008 WL 4164108, at *6 (E.D.N.Y. Sept. 5, 2008) (finding that after issuing a subpoena, there was "no evidence in the record that [the] ALJ . . . sent the follow-up request required by the regulations.")

To the extent Plaintiff alleges that the ALJ violated some compulsory duty to secure opinions from treating physicians in every case, the Commissioner is correct that no such absolute duty exists. However, although not specifically argued by Plaintiff, the Court finds that, once the ALJ asked Plaintiff to secure RFC forms from her treating physicians, he was required

to make "every reasonable effort" to procure those documents. He did not do so. Accordingly, this matter is remanded for further proceedings and development of the administrative record. On remand, the ALJ is to "make all reasonable efforts" to secure the RFC opinions he believed necessary to make an "informed decision," in accordance with his duties under the applicable regulations. If the ALJ secures those opinions, he is to reevaluate his assessment of the RFC and Plaintiff's credibility in light of the fully developed record. If the ALJ cannot, after reasonable efforts, secure those RFC opinions, he must explicitly explain how the records provided allow him to make a decision without the benefit of a treating physician's opinion.

### iii. *Plaintiff's Remaining Arguments*

Plaintiff's remaining contentions are that the ALJ's determination of her RFC and credibility were not supported by substantial evidence. *See* Pl Mem. at 19-25. However, because the Court has already determined that remand is appropriate to fully develop the record upon which the RFC and credibility assessments were based, it need not and does not consider the remaining arguments. *See Callahan*, 168 F.3d at 82 n.7 ("Because we have concluded that the ALJ was incorrect in her assessment of the medical evidence, we cannot accept her conclusion regarding . . . credibility."); *Wilson v. Colvin*, 107 F. Supp.3d 387, 407 n.34 (S.D.N.Y. 2015) (since the ALJ failed to develop the record, the Commissioner must "necessarily" reassess a claimant's RFC and credibility on remand); *Rivera v. Comm'r of Soc. Sec.*, 728 F. Supp.2d 297, 331 (S.D.N.Y. 2010) ("Because I find legal error requiring remand, I need not consider whether the ALJ's decision was otherwise supported by substantial evidence.") (internal citations omitted).

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted. Accordingly, the decision of the Commissioner is reversed, and this matter is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this opinion.

If Plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty (60) days of Plaintiff's appeal, if any. *See Butts v. Barnhart*, 388 F.3d 377, 387 (2d Cir. 2004) (suggesting procedural time limits to ensure speedy disposition of Social Security cases upon remand by district courts).


SO ORDERED.

Dated: Brooklyn, New York
      September 30, 2016

_____
/s/
DORA L. IRIZARRY
Chief Judge
